FILED
CLERK, U.S. DISTRICT COURT

APR - 1 2005

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
JS-2/JS-3 ____
Scan Only ____

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| linkLINE COMMUNICATIONS, INC., IN-REACH INTERNET LLC, Om NETWORKS, dba OMSOFT TECHNOLOGIES, NITELOG, INC. dba RED SHIFT INTERNET SERVICES, | ) ) ) ) ) ) | CV 03-5265 SVW (SHx) |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO STRIKE PORTIONS OF PLAINTIFF'S FIRST AMENDED COMPLAINT, TO DISMISS THE FIRST AMENDED COMPLAINT, OR TO CERTIFY OCTOBER 20, 2004, ORDER FOR INTERLOCUTORY APPEAL

Plaintiffs,

v.

SBC CALIFORNIA, INC., PACIFIC BELL INTERNET SERVICES, SBC ADVANCED SOLUTIONS, INC.,

Defendants.



CLERK, U.S. DISTRICT COURT
ENTERED
APR - 4 2005
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## I.  Introduction.

On July 24, 2003, Plaintiffs linkLine Communications, Inc., Inreach Internet LLC, Om Networks d/b/a Omsoft Technologies, Inc., and Nitelog, Inc. d/b/a Red Shift Internet Services (collectively "Plaintiffs") filed this action for damages and injunctive relief against Defendants SBC California, Inc., Pacific Bell Internet Services, and SBC Advanced Solutions, Inc. (collectively

"Defendants").  Plaintiffs allege, among other causes of action,

violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.[1]

On October 20, 2004, this Court held that Plaintiffs' refusal-to-deal claim was barred by the Supreme Court's decision in <u>Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko</u>, 540 U.S. 398 (2004), but that Plaintiffs' price squeeze claim was not.  The Court, however, did not rule on the viability of Plaintiffs' price squeeze claim.  Instead, because the exact nature of Plaintiffs' price squeeze claim was unclear at the time, the Court directed Plaintiffs to file an amended complaint "limited to the price squeeze claim that details beyond the normal requirements of Rule 8 specific facts supporting Plaintiffs' price squeeze claim."  Order, p. 33.

On December 7, 2004, Plaintiffs filed a First Amended Complaint for Damages and Injunctive Relief for Violations of Antitrust Laws and State Law Claims ("FAC").  In the FAC, Plaintiffs re-allege their claim that Defendants engaged in an unlawful price squeeze.  (FAC ¶ 25(A).)  In addition, Plaintiffs allege additional unlawful, anticompetitive acts which (according to Plaintiffs) demonstrate Defendants' specific intent to monopolize through a price squeeze.  (FAC ¶ 25(B).)  These acts include the precise acts which formed the basis of Plaintiffs' original refusal-to-deal claim and which this Court found could not constitute a viable refusal-to-deal claim under <u>Trinko</u>.

---

[1] Plaintiffs seek damages and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 25.  Plaintiffs also seek compensatory and exemplary damages for intentional interference with prospective economic advantage and restitution and injunctive relief for alleged unfair trade practices in violation of Section 17200 of the California Business and Professions Code.

1    On January 14, 2005, Defendants filed Defendants' Motion to

2    Strike Portions of Plaintiffs' First Amended Complaint, to Dismiss

3    the First Amended Complaint, or to Certify October 29, 2004 Order for

4    Interlocutory Appeal.  Defendants seek to have the Court (1) strike

5    the allegations contained in ¶ 25(B) from the FAC, (2) dismiss the

6    FAC for failing to state a viable price squeeze claim, (3) or certify

7    its October 20, 2005 Order for interlocutory appeal.

8    II.  FACTS[2]

9    Defendant SBC California, Inc. ("SBC") (formerly known as

10   Pacific Bell Telephone Company or PacBell) has authority to operate

11   as a local exchange carrier ("LEC"), providing local telephone

12   services to California consumers within SBC's local service area.

13   SBC is a subsidiary of SBC Communications, Inc.  On September 17,

14   1998, SBC received approval from the California Public Utilities

15   Commission ("CPUC"), in Resolution T-16191, to provide Digital

16   Subscriber Line ("DSL") services to California consumers.

17   Defendant Pacific Bell Internet Services ("PBIS") is a

18   subsidiary of SBC.  Consumers who ordered SBC's DSL and chose PBIS as

19   their ISP were billed the associated fee for Internet access on their

20   regular monthly Pacific Bell telephone billing statement under the

21   heading "Pacific Bell Internet Services."

22   Defendant SBC Advanced Solutions, Inc. ("SBC-ASI") is a

23   subsidiary of SBC Communications, Inc., and an affiliate of SBC.  In

24   June 2000, responsibility for the provisioning and billing of DSL was

25   transitioned from SBC to SBC-ASI and the CPUC granted SBC-ASI a

26   certificate of public convenience and necessity to operate as a

27   _____

28   [2] As this is a motion to dismiss, the facts are taken from the FAC.

3

1  facilities-based provider of competitive local exchange and intraLATA
2  interexchange services. SBC-ASI has since then provided DSL and
3  other advanced services to independent ISPs and California consumers.

4      Plaintiffs are Internet Service Providers ("ISPs"). ISPs are
5  commercial entities which provide consumers with access to the
6  Internet. ISPs use a variety of telecommunications facilities to
7  operate their portion of the Internet. Some ISPs own their own
8  transmission and packet switching facilities, while others purchase
9  or lease transmission or packet switches (routers). Still others
10 resell the facilities of other ISPs. Most often, ISPs will lease
11 capacity to connect customers to the Internet.

12     Many ISPs sell "dial-up" services to customers. To provide this
13 service, the ISPs obtain dedicated connections to local exchange
14 carrier central office switches and then advertise their Internet
15 telephone numbers to their subscribers who dial those numbers,
16 reaching a bank of modems that are themselves connected to the ISP's
17 portion of the Internet.

18     An increasingly popular alternative to dial-up is DSL. Many
19 consumers prefer DSL because it is faster, "always on," more
20 reliable, and allows simultaneous access by many users in the same
21 area without affecting the speed or quality of the transmission. DSL
22 can be made available over existing telephone lines. DSL service
23 uses conventional voice network to carry digital information by means
24 of a Digital Subscriber Line Access Multiplexer (DSLAM) placed in the
25 central office and a modem placed at the end-users office or home.
26 With a DSLAM at one end of the traditional copper telephone loop and
27
28

4

1  a modem at the other, it is possible to send bits of data at very

2  high rates of speed.

3      For decades, local telephone companies have owned and controlled

4  facilities that are essential to the provision of many

5  telecommunications services, including DSL service.  In most cases,

6  the incumbent LEC (here SBC) owns and controls the connections to all

7  or substantially all end user customers.  ISPs that are not

8  affiliated with the incumbent LEC must obtain access to those

9  customer connections in order to reach and serve their own end user

10  customers.  In addition, non-affiliated ISPs often need to

11  interconnect their own facilities with those of the incumbent LEC if

12  they are to be able to provide communication services on a broad

13  scale.  Because of the critical nature of the incumbent LEC's network

14  facilities, they are often referred to as "bottleneck" facilities.

15  This is especially true of the "last-mile" connection between the

16  incumbent LEC's central offices and the end-users' premises.

17      Because SBC is both an ISP (PBIS) and because SBC/SBC-ASI owns

18  and controls the bottleneck facilities without which DSL cannot be

19  provided, ISPs like Plaintiffs are in direct competition with the

20  supplier of DSL transport services.  While there are some locations

21  where ISPs have a choice of DSL providers, the majority of wholesale

22  DSL providers have ceased to operate in any significant geographic

23  region of California, and SBC-ASI enjoys virtually exclusive control

24  over DSL transport in SBC's service area (which covers approximately

25  78 percent of the geographic area of California). Moreover, because

26  Defendants offer DSL services in wholesale and retail markets, they

27  determine the cost of the critical components of the competitor ISPs'

28

service offerings.  For instance, because PBIS combines DSL with both
online services and equipment, which PBIS provides as a bundled
package to end use customers, and because PBIS has taken in excess of
80 percent of the DSL market, independent ISPs are under competitive
pressure to meet Defendants' prices and service combinations in the
marketplace

Plaintiffs allege that, beginning as early as mid-1998 and
continuing up to the filing of Plaintiffs' Complaint, Defendants,
acting as a single entity, have monopolized and attempted to
monopolize, in violation of Section 2 of the Sherman Act, the
relevant markets for providing DSL and other internet services and
local telecommunication services in those geographic boundaries of
Southern California where SBC is authorized to provide local exchange
services.

In particular, Plaintiffs allege that Defendants have engaged in
an unlawful price squeeze.  Specifically, the FAC alleges that

(1) ... [D]efendants unlawfully manipulated their dual
role as vertically integrated monopolists as both a
wholesale-monopoly supplier and retail competitor of
Plaintiffs by engaging in an unlawful price squeeze by
intentionally charging independent ISPs wholesale
prices that were too high in relation to prices at
which [D]efendants were providing retail DSL services
and necessary equipment to end-user customers -- and
for a period by charging wholesale DSL prices to
competing ISPs (such as [P]laintiffs) that actually
exceeded the prices at which [D]efendants retail

affiliate (PBIS) was charging retail end-user customers for DSL services and necessary equipment -- thereby making it impossible for independent ISP competitors such as plaintiffs to compete at the low retail prices set by [D]efendants for combined DSL-Internet Service and necessary equipment provided to end-user customers.
(2) If [P]laintiffs charged retail DSL-Internet access customers the same retail price as [D]efendants' retail affiliate charged, [P]laintiffs could not cover the cost of providing DSL service, which costs necessarily includes the wholesale transport costs charged by [D]efendants.
(3) By the same token, if [D]efendants themselves charged their retail affiliates the same wholesale costs for DSL transport that they charged their wholesale ISP customers (such as [P]laintiffs), [D]efendants could not cover their wholesale costs and make a profit from DSL service at their low retail prices for their bundled offering of DSL, Internet Service and necessary equipment (e.g., free modem and installation), that were in some cases, and for some period, even below the wholesale DSL transport cost. Given the price margin relationship between retail and wholesale prices, [D]efendants are clearly attempting to compensate for deliberately sacrificing profits on the retail end of their operations (with offsetting margins on the wholesale side) in order to stifle,

1      impede and exclude competition from independent ISPs

2      such as [P]laintiffs that are both wholesale customers

3      and retail rivals.

4  (FAC ¶ 25(A)(1)-(3).)  The FAC further alleges additional unlawful,

5  anticompetitive acts which (according to the FAC) demonstrates

6  Defendants' specific intent to monopolize.  These acts include:

7      (1) intentionally adopt[ing] anticompetitive procedures

8      and processes for handling customer ordering and

9      installation to ISPs that are calculated to (I) cause

10     ISP customer disruption and interruption of service,

11     and (ii) create extraordinary and serious delays and a

12     substantial backlog of orders, in the hope that the ISP

13     customers will revert back to [D]efendants;

14     (2) purposefully creat[ing] and impos[ing] procedures

15     and costs that impeded, and/or caused significant

16     delays and costs for, end user customers of

17     [D]efendants switching to the services of independent

18     ISPs, including [P]laintiffs, and impos[ing]

19     unreasonable and anticompetitive costs of DSL

20     aggregation-backhaul circuits necessary for providing

21     DSL service and particularly given the delays in

22     processing orders, unfairly raised the per-customer

23     costs of independent ISPs trying to compete with

24     [D]efendants;

25     (3) misle[ading], harass[ing], and exhibit[ing]

26     hostility towards customers of ISPs, including

27     [P]laintiffs;

28

(4) disparag[ing] and creat[ing] doubts about the
efficacy and legality of ISPs, including [P]laintiffs;
and

(5) purposefully fail[ing] to bill properly for DSL
services.

(FAC ¶ 25 (B)(1)-(5).)

Plaintiffs claim that, as a result of Defendants' conduct, competition in the provision of DSL services and competition in the provision of Internet services has been effectively eliminated in Defendants' California service areas. Plaintiffs estimate their damages to be in excess of $40 million.

## III. DISCUSSION

Defendants ask the Court to (1) strike the allegations set forth in ¶ 25(B) of the FAC on the grounds that they are the precise allegations dismissed by the Court in its October 20, 2004 Order, (2) dismiss Plaintiffs' price squeeze claim for failing to allege facts sufficient to state a claim of actual or attempted monopolization by price squeeze, and/or (3) certify its October 20, 2004 Order for interlocutory appeal.

### A.  Motion to Strike

Defendants move to strike the allegations set forth in ¶ 25(B) of the FAC on the ground that they are the precise allegations dismissed by the Court in its October 20 Order.[3] Plaintiffs oppose

_____

[3] The Court's October 20 Order dismissed the antitrust claims set forth in ¶ 23(b)-(f) of the original complaint. Despite this, Plaintiffs repeat those claims in ¶ 25(B)(1)-(5) of the FAC. In addition, ¶ 25(B)(2) contains an entirely new allegation pertaining to the pricing of DSL aggregation-backhaul circuits. Since the Court's October 20 Order limited Plaintiffs to re-alleging the previously dismissed price squeeze claim, Defendants request that the Court

9

1  striking the allegations on the ground that they have evidentiary

2  value on the issue of specific intent.

3      Rule 12(f) of the Federal Rules of Civil Procedure provides that

4  the court "may order stricken from any pleading any insufficient

5  defense or any redundant, immaterial, impertinent, or scandalous

6  material." Fed. R. Civ. P. 12(f). "Motions to strike are generally

7  disfavored." FTC v. Medicor LLC, 2001 WL 765628, at *2 (C.D. Cal.

8  June 26, 2001). "Courts generally do not determine disputed or

9  substantial questions of law on a motion to strike." Id. at *2.

10 However, a 12(f) motion is proper when "it is clear that the matter

11 to be stricken could have no possible bearing on the subject matter

12 of the litigation." LeDuc v. Ky. Cent. Life Ins., 814 F. Supp. 820,

13 830 (N.D. Cal. 1992). Nevertheless, "allegations supplying

14 background or historical material or other matter of an evidentiary

15 nature will not be stricken unless unduly prejudicial to defendant."

16 Id. Thus, "[w]here allegations, when read with the complaint as a

17 whole, give a full understanding [of the complaint], they need not be

18 stricken." Id. However, where the plaintiff re-alleges claims that

19 the court has already dismissed, the court may properly strike the

20 previously dismissed claims. See, e.g., Miller v. Continental

21 Airlines, Inc., 2003 WL 21557678, at *2 (N.D. Cal. July 1, 2003)

22 ("Plaintiffs' newly amended complaints contain exactly the same state

23 law causes of action and claim for punitive damages previously

24 dismissed with prejudice.... The renewed presence of these

25 allegations in the amended complaints represents impertinent

26 material."); USS-Posco Indus. v. Contra Costa County Bldg. & Constr.

27 _____

28 strike the new allegation.

1  <u>Trades Council</u>, 721 F. Sup. 239, 242 (N.D. Cal. 1989) ("The current

2  amended complaint is unacceptable because the first cause of action

3  includes a restatement of several of the claims upon which summary

4  judgment for defendants has already been granted by the Court.

5  Plaintiffs may not allege in their amended complaint causes of action

6  which have already been removed from this action by summary judgment,

7  whether or not they are asserted in combination with other valid or

8  invalid claims.").

9      Defendants are correct that the allegations set forth in ¶ 25(B)

10  of the FAC repeat the very allegations dismissed by this Court in its

11  October 20 Order.  However, the allegations need not be stricken if

12  they have some relevance to Plaintiffs' price squeeze claim, whether

13  as background or historical material or as matter of an evidentiary

14  nature.  Plaintiffs expressly claim that the allegations have

15  evidentiary value on the issue of specific intent.[4]  But as Defendants

16  correctly note, <u>Trinko</u> held that allegations of insufficient

17  assistance to rivals do not have any probative value as evidence of

18  anticompetitive intent where there has been no prior course of

19  voluntary dealings between the parties.  <u>Trinko</u>, 540 U.S. at 409

20  ("The complaint does not allege that Verizon voluntarily engaged in a

21  course of dealing with its rivals, or would ever have done so absent

22  statutory compulsion.  Here, therefore, the defendant's prior conduct

23  sheds no light upon the motivation of its refusal to deal--upon

24  whether its regulatory lapses were prompted not by competitive zeal

25  ───────────────

26  [4] In <u>City of Anaheim v. Southern California Edison Co.</u>, 955 F.2d 1373,
    1378 (9th Cir. 1992), the Ninth Circuit imposed on plaintiffs
27  alleging a price squeeze in a fully regulated industry the additional
    burden of pleading and proving that the defendant acted with specific
28  intent.

1     but by anticompetitive malice."). The Court's October 20 Order

2     dismissing Plaintiffs' refusal-to-deal claim was predicated on

3     precisely this aspect of <u>Trinko</u>: since Plaintiffs had not alleged a

4     prior course of voluntary dealings with Defendants, no inference of

5     anti-competitive intent could be drawn from the allegations of

6     insufficient assistance.  The mere fact that Plaintiffs are now

7     attempting to use these allegations to buttress their price squeeze

8     claim does not alter this analysis.  Under <u>Trinko</u>, allegations of

9     insufficient assistance to rivals can have no evidentiary value as to

10     anticompetitive intent where the parties have not engaged in a prior

11     course of voluntary dealings.  It does not matter whether the

12     underlying claim is a refusal-to-deal claim or, as here, a price

13     squeeze claim.  Thus, since the allegations contained in ¶ 25(B) of

14     the FAC have no evidentiary value on the issue of anticompetitive

15     intent, Plaintiffs' attempt to defend their inclusion on this ground

16     fails.  Consequently, the Court GRANTS the motion to strike.

17        B.    <u>Motion to Dismiss</u>

18        Defendants move to dismiss Plaintiffs' price squeeze claim.

19     Relying on the principles set forth in <u>Brooke Group Ltd. v. Brown &</u>

20     <u>Williamson Tobacco Corp.</u>, 509 U.S. 209 (1993), Defendants contend

21     that the FAC fails to allege facts sufficient to state a claim of

22     actual or attempted monopolization by price squeeze.  Specifically,

23     Defendants claim that the FAC does not sufficiently allege below-cost

24     pricing or a dangerous probability of recoupment.  Plaintiffs counter

25     that the requirements set forth in <u>Brooke Group</u> do not apply to price

26     squeeze claims and that, even if they did, the allegations contained

27     in the FAC satisfy them.

28

1        To state a claim of monopolization under Section 2 of the

2    Sherman Act, a plaintiff must allege that (1) the defendant possesses

3    monopoly power in the relevant market; (2) the defendant has

4    willfully acquired or maintained that power, and (3) the defendant's

5    conduct has caused antitrust injury. Cost Mgt. Servs., Inc. v.

6    Washington Natural Gas Co., 99 F.3d 937, 949 (9th Cir. 1996). In

7    City of Anaheim v. Southern California Edison Co., 955 F.2d 1373,

8    1378 (9th Cir. 1992), the Ninth Circuit imposed on plaintiffs

9    alleging a price squeeze in a fully regulated industry the additional

10    burden of pleading and proving that the defendant acted with specific

11    intent. To state a claim of attempted monopolization under Section 2

12    of the Sherman Act, a plaintiff must allege: "(1) a specific intent

13    to control prices or destroy competition; (2) predatory or

14    anticompetitive conduct directed at accomplishing that purpose; (3) a

15    dangerous probability of achieving 'monopoly power'; and (4) causal

16    antitrust injury." Image Technical Servs. v. Eastman Kodak Co., 125

17    F.3d 1195, 1202 (9th Cir. 1997) (quoting Rebel Oil Co., Inc. v.

18    Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1998)).

19        In order to survive a motion to dismiss under Rule 12(b)(6), "an

20    antitrust complaint 'need only allege sufficient facts from which the

21    court can discern the elements of an injury resulting from an act

22    forbidden by the antitrust laws.'" Cost Mgmt., 99 F.3d at 950

23    (quoting Newman v. Universal Pictures, 813 F.2d 1519, 1522 (9th Cir.

24    1987)). Whether a specific act or set of acts is anti-competitive is

25    a question of law. SmileCare Dental Group v. Delta Dental Plan of

26    Cal., Inc., 88 F.3d 780, 783 (9th Cir. 1996). "Dismissal for failure

27    to state a claim is appropriate where 'the complaint states no set of

28

1 | facts which, if true, would constitute an antitrust offense,

2 | notwithstanding its conclusory language regarding the elimination of

3 | competition and improper purpose.'" <u>Id.</u> (quoting <u>Rutman Wine Co.</u> v.

4 | <u>E. & J. Gallo Winery</u>, 829 F.2d 729, 735 (9th Cir. 1987)).

5 |   The issue here is whether the FAC states a viable price squeeze

6 | claim. Defendants contend that the FAC does not state a viable price

7 | squeeze claim because Plaintiffs do not allege that Defendants were

8 | pricing below cost or that there was a dangerous probability that

9 | Defendants would recoup their investment. Defendants claim that

10 | these elements are required by the Supreme Court's decision in <u>Brooke</u>

11 | <u>Group</u>.

12 |   In <u>Brooke Group</u>, the Supreme Court held that there are two

13 | prerequisites to recovery when a plaintiff "alleges predatory

14 | pricing under § 2 of the Sherman Act or primary-line price

15 | discrimination under the Robinson-Patman Act." <u>Brooke Group</u>, 509

16 | U.S. 222.[5] They are:

17 |   First, a plaintiff seeking to establish competitive

18 |   injury resulting from a rival's low prices must prove

19 |   that the prices complained of are below an appropriate

20 |   measure of its rival's costs.... The second

21 |   prerequisite ... is a demonstration that the competitor

22 |   had a reasonable prospect, or, under § 2 of the Sherman

23 |   Act, a dangerous probability, of recouping its

24 |   investment in below-cost prices.

25 |

26 | [5] Although <u>Brooke Group</u> involved a claim of primary-line price
discrimination under the Robinson-Patman Act, the Court found that

27 | "primary-line competitive injury under the Robinson-Patman is of the
same general character as the injury inflicted by predatory pricing

28 | schemes actionable under § 2 of the Sherman Act." <u>Id.</u> at 221.

1  Id. at 222-24.  The Court justified the first requirement on the

2  ground that, as a general proposition, "the exclusionary effect of

3  prices above a relevant measure of cost either reflects the lower

4  cost structure of the alleged predator, and so represents competition

5  on the merits, or is beyond the practical ability of a judicial

6  tribunal to control without courting intolerable risks of chilling

7  legitimate price-cutting."  Id. at 223.  The Court justified the

8  second requirement on the ground that, without recoupment, "predatory

9  pricing produces lower aggregate prices in the market, and consumer

10  welfare is enhanced."  Id. at 224.

11      Although the Court in Brooke Group did not hold that the two

12  requirements applied to price squeeze claims, at least one court of

13  appeals has applied them to price squeeze claims.  See Covad

14  Communications Co. v. BellSouth Corp., 374 F.3d 1044, 1050 (11th Cir.

15  2004) ("Covad II").  Moreover, although the Court in Brooke Group did

16  not frame the requirements in terms of pleading standards, at least

17  one court of appeals has applied the requirements to a motion to

18  dismiss under Rule 12(b)(6).  See id. (finding that the plaintiff's

19  allegations stated a viable price squeeze under the Brooke Group

20  requirements).  As a threshold matter, this Court must decide whether

21  it will follow the example of Covad II.

22      The court in Covad II provided no explanation for why it applied

23  the Brooke Group requirements to the plaintiff's price squeeze claim.

24  The failure of the court to explain its rationale for applying the

25  Brooke Group requirements is surprising given the fact that the issue

26  had been debated by the parties earlier in the litigation.  See Covad

27  Communications Co. v. BellSouth Corp., 299 F.3d 1272, 1290-91 (11th

28

15

Cir. 2002) ("<u>Covad I</u>"), <u>vacated</u>, 124 S. Ct. 1143 (2004).[6]
Nonetheless, the Court's justification in <u>Brooke Group</u> for treating
predatory pricing claims under Section 2 as analogous to primary-line
price discrimination claims under Robinson-Patman is so broad that it
can be fairly read as applying with equal force to price squeeze
claims.[7]  After all, the essence of a price squeeze claim is that a
rival has priced its products in an unfair manner with the object to
eliminate or retard competition and thereby gain and exercise control
over prices in the relevant market.  Nonetheless, Defendants have not
cited, and the Court has not found, any other case that applies the
<u>Brooke Group</u> requirements to a price squeeze claim.  For instance, in
<u>Covad Communications Co. v. Pacific Bell</u>, 1999 WL 33757058, at *11
(N.D. Cal. Dec. 14, 1999), the court denied a motion to dismiss a
price squeeze claim without discussing, much less applying, the
<u>Brooke Group</u> requirements.  Instead, the court denied the motion to
dismiss on the ground that the plaintiff had alleged, in addition to
an illegal price squeeze, "various forms of anti-competitive
conduct," including "fraud, negligent misrepresentation, statutory

---

[6] In <u>Covad I</u>, the defendant argued that the plaintiff was required to
allege below-cost pricing.  <u>Id.</u> at 1290.  The defendant cited <u>Brooke
Group</u> in support of its claim.  <u>Id.</u> at 1291 n.17.  In response, the
plaintiff argued that "whether or not there is a price squeeze should
not depend on whether retail prices are 'too low,' but rather on the
'squeeze' created by the disparity between the wholesale prices [the
plaintiff] must pay [the defendant] upstream and the prices [the
plaintiff] must charge downstream to remain competitive with [the
defendant]."  <u>Id.</u> at 1291.

[7] The Court explained that "the essence of a claim under either statute
[i.e., the Robinson-Patman Act and the Sherman Act] is the same: A
business rival has priced its products in an unfair manner with an
object to eliminate or retard competition and thereby gain and
exercise control over prices in the relevant market."  <u>Brooke Group</u>,
509 U.S. at 222.

1  and common law unfair competition, and interference with prospective

2  economic advantage." <u>Id.</u>  The court apparently viewed these

3  allegations as stating facts that, if true, would suffice as evidence

4  of specific intent under <u>City of Anaheim</u>.

5       In light of the dearth of case law applying the <u>Brooke</u>

6  <u>Group</u> requirements to price squeeze claims, this Court is reluctant

7  to impose the <u>Brooke Group</u> requirements.  Nevertheless, there are

8  strong policy arguments for applying the <u>Brooke Group</u> requirements to

9  price squeeze claims.

10      A price squeeze is, of course, structurally distinct from a

11 predatory pricing scheme.  The Supreme Court has defined predatory

12 pricing as "pricing below an appropriate measure of cost for the

13 purpose of eliminating competitors in the short run and reducing

14 competition in the long run." <u>Cargill, Inc. v. Monfort of Colo.</u>, 479

15 U.S. 104, 117 (1986).  Nothing in this definition requires that a

16 firm operate at both the wholesale and retail level in order to

17 engage in predatory pricing.  By contrast, "[a] firm can engage in a

18 price squeeze only if it operates both as a retailer and a wholesaler

19 whose customers are also its competitors.  A price squeeze occurs

20 when that firm's price as a wholesaler is too high or as a retailer

21 is too low for the competitor to stay in business." <u>CTC</u>

22 <u>Communications Corp. v. Bell Atl. Corp.</u>, 77 F. Supp. 2d 124, 142 (D.

23 Me. 1999).  Thus, there is an undeniable structural distinction

24 between a price squeeze and a predatory pricing scheme.  But

25 notwithstanding this distinction, it simply us not true, as

26 Plaintiffs contend, that a price squeeze can be meaningfully

27 distinguished from a predatory pricing scheme in terms of the anti-

28

17

competitive harm or injury inflicted.[8]  Plaintiff's reliance on the

Ninth Circuit's statement in <u>City of Anaheim</u> that "[t]he vice that a

price squeeze has is that it can be used to cause severe damage to

competitors by unjustifiably raising the costs of doing business,"

<u>City of Anaheim</u>, 955 F.2d 1373, is thus misplaced.  As a statement of

antitrust law, this statement <u>cannot</u> be taken as literally as

Plaintiffs suggest.  For as the Supreme Court and the Ninth Circuit

has repeatedly emphasized, the antitrust laws exist to protect

competition, not competitors.  <u>See, e.g.,</u> <u>Brooke Group</u>, 509 U.S. 209

("It is axiomatic that the antitrust laws were passed for 'the

protection of competition, not competitors.'") (quoting <u>Brown Shoe</u>

<u>Co. v. United States</u>, 370 U.S. 294, 320 (1962)); <u>Brunswick Corp. v.</u>

<u>Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 488 (1977) ("The antitrust

laws ... were enacted for 'the protection of competition[,] not

competitors.'") (quoting <u>Brown Shoe</u>, 370 U.S. at 320); <u>Brown Shoe</u>,

370 U.S. at 320 ("Taken as a whole, the legislative history [of the

Sherman Act] illuminates congressional concern with the protection of

competition, not competitors, and its desire to restrain mergers only

to the extent that such combinations may tend to lessen

competition."); <u>Or. Laborers-Employers Health & Welfare Trust Fund v.</u>

<u>Philip Morris Inc.</u>, 185 F.3d 957, 966 (9th Cir. 1999) ("'The

antitrust laws ... were enacted for the protection of competition,

not competitors.'") (quoting <u>Brunswick Corp.</u>, 429 U.S. at 488);

<u>Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.</u>, 141 F.3d

---

[8] Plaintiffs argue that the harm inflicted by a price squeeze inheres
in the higher costs imposed upon the wholesale monopolist's retail
competitors, not the lower prices charged at the retail level by the
wholesale monopolist.

947 (9th Cir. 1998) ("Antitrust laws are designed to protect

competition, not competitors."); <u>Legal Econ. Evaluations, Inc.</u> <u>v.</u>

<u>Metro. Life Ins. Co.</u>, 39 F.3d 951, 954 (9th Cir. 1994) ("The

antitrust laws were enacted for 'the protection of competition, not

competitors.'") (quoting <u>Brown Shoe</u>, 370 U.S. at 320); <u>United States</u>

<u>v. Syufy Enters.</u>, 903 F.2d 659, 668 (9th Cir. 1990) ("It can't be

said often enough that the antitrust laws protect competition, not

competitors."); <u>Oahu Gas Serv., Inc. v. Pac. Res., Inc.</u>, 838 F.2d

360, 370 (9th Cir.1988) ("The goal of the antitrust laws, however,

unlike that of business tort or unfair competition laws, is to

safeguard general competitive conditions, rather than to protect

specific competitors."); <u>Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.</u>,

627 F.2d 919, 927 (9th Cir. 1980) ("Of course, it is free and open

competition that the Sherman Act protects, and not any right of one

competitor to be free of rough treatment at the hands of another.");

<u>Ackerman-Chillingworth, Div. of Marsh & McLennan, Inc. v. Pac. Elec.</u>

<u>Contractors Ass'n</u>, 579 F.2d 484, 492 (9th Cir. 1978) ("The Sherman

Act protects competition, not competitors who may suffer some

pecuniary harm because of the competitive process.").[9]  Thus, the vice

_____

[9] <u>But see</u> <u>Hasbrouck v. Texaco, Inc.</u>, 842 F.2d 1034, 1040 (9th Cir.
1988) ("The oft-quoted chestnut distinguishing between protecting
competition and protecting competitors has been misconstrued with
some regularity by antitrust defendants who appear to argue in all
types of antitrust cases that the effect of unlawful conduct on
competitors is irrelevant.  The purpose of drawing a distinction
between harm to competition and harm to competitors is to point out
that not all acts that harm competitors harm competition.  However,
the converse is not true.  Injury to competition necessarily entails
injury to at least some competitors.  Competition does not exist in a
vacuum; it consists of rivalry among competitors.  Clearly, injury to
competitors may be probative of harm to competition....  The aphorism
may not be invoked blindly in response to a showing that competitors
have been harmed; otherwise it would often serve to shield unlawful

of a price squeeze cannot consist solely in the higher costs imposed

upon the wholesale monopolist's retail competitors.  (Nor, for that

matter, can it consist solely in the lower retail prices charged by

the wholesale-level monopolist.)  Rather, a price squeeze is vicious

only if the wholesale-level monopolist is able to achieve or has a

dangerous probability of achieving dominant market position at the

retail level as a result.[10]  Absent this element, there is no reason

to suppose that the damage done to the firm's retail competitors is,

ipso facto, damage done to competition.  As Areeda and Hovenkamp

note, "It is critically important to realize that not all price

squeezes are invidious.  Most are not."  3 Phillip Areeda & Herbert

Hovenkamp, Antitrust Law ¶767c, at 126 (2d ed. 2002).  Indeed, Areeda

and Hovenkamp note that a price squeeze may reflect five market

realities, only the last of which raises a question of anti-

competitive conduct: "(1) an adverse change in cost or demand

conditions, (2) the elimination of monopoly profits at the second

level, (3) the monopolist's increased efficiency, (4) indirect price

discrimination, or (5) predatory pricing."  Id. at 126-27.  Likewise,

conduct that adversely affects competition.").

[10] In this respect, the objective of a price squeeze is no different
from that of predatory pricing.  Compare William Inglis & Sons Baking
Co. v. ITT Continental Baking Co., Inc., 668 F.2d 1014, 1031-1032
(9th Cir. 1981) ("'Pricing is predatory only where the firm foregoes
short-term profits in order to develop a market position such that
the firm can later raise prices and recoup lost profits....'")
(quoting Janich Bros., Inc. v. Am. Distilling Co., 570 F.2d 848, 856
(9th Cir. 1978)) with Cities of Anaheim, Riverside, Banning, Colton &
Asuza v. Fed. Energy Regulatory Comm'n, 941 F.2d 1234, 1250 (D.C.
Cir. 1991) ("[A] [p]rice squeeze occurs when a firm with monopoly
power on the primary, or wholesale, level engages in a prolonged
price increase that drives competitors out of the secondary, or
retail, level, and thereby extends its monopoly power to the
secondary market.") (emphasis added).

20

1  the First Circuit noted in <u>Town of Concord v. Boston Edison Co.</u>, 915

2  F.2d 17, 24 (1st Cir. 1990), that there are at least two

3  circumstances in which a price squeeze may be beneficial.  The first

4  circumstance is where the wholesale-level monopolist is able to carry

5  out its retail-level activities more efficiently than its independent

6  competitors.  <u>Id.</u>  The second is where the retail-level firm being

7  squeezed is itself a monopolist.  <u>Id.</u>  In light of these

8  considerations, there are sound policy reasons for applying the

9  <u>Brooke Group</u> requirements to price squeeze claims.[11]

10  Plaintiffs have offered two principal arguments against the

11  application of the <u>Brooke Group</u> requirements to price squeeze claims.

12  First, in the round of briefing which preceded the Court's October

13  20, 2004 Order, Plaintiffs argued that the <u>Brooke Group</u> requirements

14  do not apply here because Plaintiffs' price squeeze claim is more

15  analogous to a secondary-line price discrimination case.  While it is

16  true that <u>Brooke Group</u> does not, on its face, apply to secondary-line

17  price discrimination claims[12], Plaintiffs' counsel acknowledged at the

18

19  [11] It is important to note, however, that Areeda and Hovenkamp warn
    that a predatory price squeeze which consists in raising the
20  wholesale price could be effected in some circumstances with little
    or no short-run loss of profits.  Areeda & Hovenkamp, <u>Antitrust Law</u>,
21  ¶ 767c5 at 129.

22  [12] Plaintiffs initially relied on <u>Chroma Lighting v. GTE Products</u>
    <u>Corp.</u>, 111 F.3d 653 (9th Cir. 1997), for this proposition.  However,
23  while it is true that the court in <u>Chroma Lighting</u> "decline[d] to
    extend the reasoning of <u>Brooke Group</u> to secondary-line cases because
24  of the significant differences between primary- and secondary-line
    claims," <u>id.</u> at 658, <u>Chroma Lighting</u> involved a claim brought under
25  the Robinson-Patman Act.  Thus, the holding in <u>Chroma Lighting</u> is
    technically limited to cases brought under the Robinson-Patman Act.
26  Moreover, the court's reasoning in <u>Chroma Lighting</u> does not justify
    expanding its holding to claims under Section 2.  The court grounded
27  its decision in the language and legislative history of the Robinson-
    Patman Act.  <u>Id.</u> at 658.  Thus, a fair reading of <u>Chroma Lighting</u>
28

1  September 21, 2004 hearing that Plaintiffs' allegations are more

2  analogous to a primary-line price discrimination claim.  Given this

3  admission and the fact that Plaintiffs abandoned this argument in the

4  latest round of briefing, the Court will not address it.

5      Second, Plaintiffs argue that, in order to survive a motion to

6  dismiss for failure to state a claim, a plaintiff alleging a price

7  squeeze need only allege that the wholesale price was greater than

8  the retail price.  According to Plaintiffs, courts will presume an

9  illegal price squeeze where the wholesale price was greater than the

10 retail price.  This test -- known as the "comparative billing" test -

11 - was famously applied by the district court in City of Mishawaka v.

12 Am. Elec. Power Co., Inc., 465 F. Supp. 1320, 1328-1329 (N.D. Ind.

13 1979), aff'd in part, vacated in part, 616 F.2d 976 (7th Cir. 1980).

14 However, the court in Mishawaka did not frame the test in terms of a

15 presumption[13], and this Court is hard pressed to find any case

16 authority for such a presumption.  See, e.g., Ray v. Ind. & Mich.

17 Elec. Co., 606 F. Supp. 757, 777 (N.D. Ind. 1984) ("The court's

18 decision in City of Mishawaka v. American Electric Power Co. does not

19 require this court to refer the comparative billing test for a price

20

21

22 does not permit the expansive reading urged by Plaintiffs.  However,
   an expansive reading of Chroma Lighting is not needed to limit Brooke

23 Group's holding.  Brooke Group has already done that.  As the First
   Circuit has noted, the holding of Brooke Group "on its face applies

24 only to primary-line cases, not secondary-line cases."  Coastal Fuels
   of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 193

25 (1st Cir. 1996).  The Court in Brooke Group specified that the two
   prerequisites applied to "claims alleging predatory pricing under § 2

26 of the Sherman Act or primary-line price discrimination under the
   Robinson-Patman Act."  Id. at 222 (emphasis added).

27

28 [13] In fact, the court cited numerous other anti-competitive acts by the
   defendants.  Id.

1  squeeze.  In that case the court found a price squeeze solely on the

2  basis of such a test, but the court there was not presented with any

3  alternative tests.").[14]  In fact, the comparative billing test is only

4  one of three tests used by courts.  See id. at 776-77 (discussing the

5  "comparative rate of return" test and the "transfer price" test).

6  Thus, Plaintiffs' argument that "well established price squeeze

7  authorities firmly support a free-standing basis for imposing Section

8  2 liability for cases ... where wholesale prices were set higher than

9  retail [prices]," Pl.'s Opp'n at 2, is simply unfounded.

10     Thus, the Court is inclined to apply the Brooke Group

11  requirements to Plaintiffs' price squeeze claim.  While the Court

12  recognizes that there is a dearth of case law applying the Brooke

13  Group requirements to price squeeze claims, the Court finds the

14  policy arguments in favor of their application persuasive.

15  Nevertheless, the Court concludes that it need not and should not

16  resolve this difficult issue at this time.[15]  First, the Court would

17  benefit from further briefing and a fully developed factual record.

18  Second, the Court finds that, even if the Brooke Group requirements

19  were applied, the FAC would satisfy those requirements.

20     As noted above, the FAC alleges that

22  [14] In Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 808-09
23  (3d Cir. 1985), the court noted that the evidence showed that the
   price for aluminum pipe was "for a significant period of time in
24  1974" "just above, or even below" the price for aluminum coil but
   quickly added that "[t]he mere existence ... of a 'price squeeze' is
25  not necessarily an antitrust violation.  The plaintiff must present
   evidence that the defendants deliberately produced the effect,
26  sufficient to provide a reasonable basis for the jury to conclude
   that the 'squeeze' was not the result of natural market forces such
27  as supply or demand or legitimate competition."

28  [15] The issue will thus be revisited at summary judgment.

23

1   (1) ... [D]efendants unlawfully manipulated their dual

2   role as vertically integrated monopolists as both a

3   wholesale-monopoly supplier and retail competitor of

4   Plaintiffs by engaging in an unlawful price squeeze by

5   intentionally charging independent ISPs wholesale

6   prices that were too high in relation to prices at

7   which [D]efendants were providing retail DSL services

8   and necessary equipment to end-user customers -- and

9   for a period by charging wholesale DSL prices to

10  competing ISPs (such as [P]laintiffs) that actually

11  exceeded the prices at which [D]efendants retail

12  affiliate (PBIS) was charging retail end-user customers

13  for DSL services and necessary equipment -- thereby

14  making it impossible for independent ISP competitors

15  such as plaintiffs to compete at the low retail prices

16  set by [D]efendants for combined DSL-Internet Service

17  and necessary equipment provided to end-user customers.

18  (2) If [P]laintiffs charged retail DSL-Internet access

19  customers the same retail price as [D]efendants' retail

20  affiliate charged, [P]laintiffs could not cover the

21  cost of providing DSL service, which costs necessarily

22  includes the wholesale transport costs charged by

23  [D]efendants.

24  (3) By the same token, if [D]efendants themselves

25  charged their retail affiliates the same wholesale

26  costs for DSL transport that they charged their

27  wholesale ISP customers (such as [P]laintiffs),

28

1    [D]efendants could not cover their wholesale costs and

2    make a profit from DSL service at their low retail

3    prices for their bundled offering of DSL, Internet

4    Service and necessary equipment (e.g., free modem and

5    installation), that were in some cases, and for some

6    period, even below the wholesale DSL transport cost.

7    Given the price margin relationship between retail and

8    wholesale prices, [D]efendants are clearly attempting

9    to compensate for deliberately sacrificing profits on

10   the retail end of their operations (with offsetting

11   margins on the wholesale side) in order to stifle,

12   impede and exclude competition from independent ISPs

13   such as [P]laintiffs that are both wholesale customers

14   and retail rivals.

15   (FAC ¶ 25(A)(1)-(3).)

16       While Defendants are correct that, strictly construed, the FAC

17   falls short in a number of respects, the Court may not grant a motion

18   to dismiss "unless it appears beyond doubt that the plaintiff can

19   prove no set of facts in support of his claim which would entitle him

20   to relief." Conley v. Gibson, 355 U.S. 41. 45-46 (1957).  Here,

21   Plaintiffs can clearly prove a set of facts in support of their price

22   squeeze claim that would entitle them to relief.[16]

23       While it is true that, as Defendants argue, subparagraphs (1)

24   and (2) of ¶ 25(A) contain no allegation that Defendants' prices are

25

26

27   [16] Moreover, as Plaintiffs note, the FAC contains price squeeze
     allegations substantially similar to those approved by the Court in
28   Covad II.

25

1   below a relevant measure of Defendants' costs[17], subparagraph (3)

2   contains something approximating an allegation of below-cost pricing.

3   True, subparagraph (3) is not phrased as a factual allegation but as

4   a conditional if-then statement, but Plaintiffs' counsel assured the

5   Court at the February 28, 2005 hearing that the allegation of below-

6   cost pricing was phrased in this way simply because Plaintiffs do not

7   believe that they are required to allege below-cost pricing and did

8   not wish to be bound to proving below-cost pricing.  While less than

9   satisfactory, Plaintiffs' counsel's explanation is credible.[18]  Thus,

10  the Court will not dismiss the FAC on this ground.

11      More problematic is the issue of whether the FAC adequately

12  alleges a dangerous probability of recoupment.  As Defendants note,

13  nowhere in these paragraphs do Plaintiffs allege a dangerous

14  probability of recoupment within the meaning of Brooke Group.  As the

15  Court explained in Brooke Group, for recoupment to occur, the

16  predators "'must obtain enough market power to set higher than

17  competitive prices, and then must sustain those prices long enough to

18  earn in excess profits what they earlier gave up in below-cost

19  prices.'" Brooke Group, 509 U.S. at 225-26 (quoting Matsushita Elec.

20  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 590-91 (1986)).

21  Stated otherwise, "[t]he plaintiff must demonstrate that there is a

22  likelihood that the predatory scheme alleged would cause a rise in

23  prices above a competitive level that would be sufficient to

24  _____

25  [17] Instead, they allege only that Plaintiffs cannot make a profit by
    charging the retail prices Defendants charge.

26
    [18] Because the applicability of the Brooke Group requirements to price
27  squeezes had arisen in the first round of briefing, Plaintiff's
    counsel knew that Defendants would move to dismiss the FAC on this
28  basis.

compensate for the amounts expended on the predation, including the time value of the money invested in it." Brooke Group, 509 U.S. at 225. Nowhere in subparagraphs (1) through (3) do Plaintiffs allege that Defendants will be able, as a result of the alleged price squeeze, to obtain enough market power in the retail market in order to set supracompetitive prices for a sustained period of time. Instead, subparagraph (3) alleges only that Defendants are compensating for their low retail prices by setting their wholesale prices high. While Plaintiffs are correct that the Covad II court found such allegations sufficient under the second prong of Brooke Group, see Covad II, 374 F.3d at 1051 ("These allegations suggest that BellSouth is compensating for deliberately reduced profits on the retail end of its operations with correspondingly greater profits on the wholesale side, in order to stifle competition from firms such as Covad.... We find that these allegations are sufficient to allege a dangerous probability that BellSouth will recoup its investment in below-cost prices.") (internal quotations omitted), the simple fact is that such allegations do not suffice under Brooke Group. Under Brooke Group, recoupment must take the form of a sustained rise in prices sufficient for the would-be monopolist to recapture the income lost as a result of the earlier campaign of below-cost pricing. There is no such allegation here. Thus, subparagraph (3), standing alone, would not suffice under Brooke Group. Nonetheless, the FAC elsewhere alleges something akin to a dangerous probability of recoupment within the meaning of Brooke Group. At ¶ 26(b), the FAC alleges that, as a result of Defendants' anti-competitive conduct, "competition in the provision of Internet services has been

effectively eliminated in defendants' California service areas, and

consumers have been deprived of lower prices, a choice of service

providers, greater efficiency and enhanced products." (FAC ¶ 26(b).)

While this sentence does not explicitly allege supracompetitive

pricing or that Defendants will be able to price at such a level for

a sustained period of time, it suffices for pleading purposes.

#### C.   Interloctuory Appeal

In the alternative, Defendants ask the Court to certify its

October 20, 2004 Order for interlocutory appeal. Under 29 U.S.C. §

1292(b), a district judge may certify for interlocutory appeal an

order not otherwise appealable if the judge is of the opinion the

"order involves a controlling question of law as to which there is

substantial ground for difference of opinion and that an immediate

appeal from the order may materially advance the ultimate termination

of the litigation, he shall so state in writing in such order."  28

U.S.C. § 1292(b).

"Generally, interlocutory appeal should be granted 'sparingly.'"

A&J Deutscher Family Fund v. Bullard, 1987 WL 16951, at *1 (C.D. Cal.

March 25, 1987) (quoting United States Rubber Co. v. Wright, 359 F.2d

784, 785 (9th Cir. 1966)). "[T]he legislative history of 1292(b)

indicates that this section was to be used only in exceptional

situations in which allowing an interlocutory appeal would avoid

protracted and expensive litigation."  In re Cement Antitrust Litig.,

673 F.2d 1020, 1026 (9th Cir. 1982). Moreover, "district court

judges have 'unfettered discretion' to deny certification even when

all three [statutory criteria] are satisfied." Marshall v. City of

Portland, 2004 WL 1774532, at *1 (D. Or. Aug. 9, 2004).

1      1.   <u>Controlling Question of Law</u>

2         An issue is "controlling" within the meaning of § 1292(b) if the

3      "resolution of that issue on appeal could materially affect the

4      outcome of the litigation in the district court."   <u>In re Cement</u>

5      <u>Antitrust Litig.</u>, 673 F.2d at 1026.   A "question of law" generally

6      means a "pure question of law."   <u>Marshall</u>, 2004 WL 1774532, at *2;

7      <u>but see</u> <u>Steering Comm. v. United States</u>, 6 F.3d 572 (9th Cir. 1993)

8      (explaining that the presence of a pure question of law permits the

9      court to resolve all questions, even mixed questions of law and fact,

10     material to the order).

11        The question of whether <u>Trinko</u> bars price squeeze claims in a

12     fully regulated industry is undoubtedly a pure question of law.   And

13     the resolution of this issue will materially affect the outcome of

14     the instant litigation since a decision by the Ninth Circuit holding

15     that price squeeze claims are barred under <u>Trinko</u> would terminate

16     Plaintiffs' suit.

17        2.   <u>Substantial Ground for Difference of Opinion</u>

18        In determining whether a "substantial ground for difference of

19     opinion" exists, courts look at a variety of factors.   For instance,

20     while some courts have held that a substantial ground for difference

21     of opinion is established by "a dearth of precedent within the

22     controlling jurisdiction and conflicting decisions in other

23     circuits," <u>APCC Servs., Inc. v. AT&T Corp.</u>, 297 F. Supp. 2d 101, 107

24     (D.D.C. 2003), other courts have held that a substantial ground for

25     difference of opinion exists where the "issues are difficult and of

26     first impression."   <u>Klinghoffer v. S.N.C. Achille Lauro Ed Altri-</u>

27     <u>Gestione Montonave Achille Lauro in Amministrazione Straordinaria</u>,

28

1  921 F.2d 21, 25 (2d Cir. 1990); but see In re Flor, 79 F.3d 281, 284

2  (2d Cir. 1996) ("[T]he mere presence of a disputed issue that is a

3  question of first impression, standing alone, is insufficient to

4  demonstrate a substantial ground for difference of opinion.").

5  However, most courts agree that the most important factor is "the

6  strength of the arguments in opposition to the challenged ruling...."

7  APCC Servs., 297 F. Supp. 2d at 107; see also In re Flor, 79 F.3d at

8  284.

9      Here, there is clearly a dearth of controlling precedent within

10  the Ninth Circuit.  Moreover, there is, as a result of Covad

11  Communications Co. v. Bell Atlantic Corp., 398 F.3d 666 (D.C. 2005),

12  conflicting authority outside the Ninth Circuit.[19]  While Plaintiffs

13  argue that the facts in Covad Communications can be distinguished

14  from those at issue here or in Covad II, the reality is that there is

15  now a circuit split.  This fact weighs in favor of granting

16  Defendants' request that the Court certify its October 20 Order for

17  interlocutory appeal.

18      More importantly, Defendants' arguments are strong.  While the

19  Court remains convinced that Defendants misread Trinko by conflating

20  the first inquiry under Trinko (i.e., does the plaintiff's claim

21  state a cognizable antitrust violation under existing antitrust

22  standards?) with the second (i.e., should antitrust law be expanded

23  to encompass plaintiff's claim?)[20], the Court recognizes that Trinko

24

_____

25  [19] In Covad Communications, the Court of Appeals for the District of
   Columbia Circuit concluded that Trinko barred the plaintiffs' price
26  squeeze allegation.  Id. at 673-74.

27  [20] In Trinko, the Court first determined whether the plaintiff's claim
   fell within the existing exceptions to the "no duty to deal" rule.
28  Trinko, 540 U.S. at 407-11.  Only then did the Court examine whether

1  could be interpreted differently.  Moreover, there is persuasive

2  appeal to Defendants' argument that the underlying logic of <u>Trinko</u>,

3  which is that no inference of anticompetitive intent can be drawn

4  from a refusal to deal where the parties are compelled by law to

5  deal, applies with equal force to price squeeze claims since a price

6  squeeze claim is, in essence, a claim that the wholesale-level

7  monopolist is not dealing with its retail-level competitors on the

8  competitors' preferred terms.  The Court rejected this argument in

9  its October 20 Order on the ground that <u>Trinko</u> specifically held that

10  it did not apply to antitrust claims which are cognizable under

11  existing case law.  But as Defendants point out, price squeeze claims

12  are no more well established under existing case law than are

13  refusal-to-deal claims.[21]  Thus, although the Court remains firmly

14  convinced that it decided the issue correctly, it recognizes that

15

16  _____

17  traditional antitrust principles (i.e., the policies underlying
   antitrust law) justified adding the plaintiff's claim to the existing

18  body of cognizable antitrust claims.  <u>Id.</u> at 411-15.  The Ninth
   Circuit employed precisely this analytical framework in <u>Metronet</u>

19  <u>Services Corp. v. Qwest Corp.</u>, 383 F.3d 1124 (2004).  First, the
   court discussed whether the plaintiff's claim fell within the

20  existing exceptions to the "no duty to deal" rule.  <u>Id.</u> at 1130-34.
   Only then did it examine whether it should expand the contours of

21  Section 2 liability in order to accommodate the plaintiff's claim.
   <u>Id.</u> at 1134-37.  It was at this point that the court "weigh[ed] the

22  'benefits of antitrust intervention' against 'a realistic assessment
   of its costs.'" <u>Id.</u> at 1134.  Here, Defendants are conflating these

23  two inquiries, asking the Court to preclude Section 2 liability in a
   fully regulated industry even under existing antitrust law because

24  the costs of such regulation outweigh its benefits.  <u>Trinko</u> did not
   announce such a wholesale rethinking of antitrust law.

25

26  [21] The Court remains convinced that this argument misconstrues <u>Trinko</u>.
   The first inquiry under <u>Trinko</u> is not whether a particular type of

27  antitrust claim is well established but whether the plaintiff states
   a claim under existing antitrust case law, whether or not that

28  particular type of claim is well established.

1  Defendants arguments are sufficient to establish that a substantial
2  ground for difference of opinion exists.

3       3.   <u>Resolution of the Issue Would Materially Advance the</u>
4            <u>Ultimate Termination of the Litigation</u>

5       For the reasons explained above, there can be no doubt that the
6  resolution of this issue would materially advance the ultimate
7  termination of the litigation.   Thus, the Court GRANTS Defendants'
8  request that the Court certify its October 20 Order for interlocutory
9  appeal.[22]

10 **IV.  CONCLUSION**

11      Because the allegations set forth in ¶ 25(A) of the FAC can have
12 no evidentiary value on the issue of anticompetitive intent under
13 <u>Trinko</u>, the Court GRANTS Defendants' Motion to Strike Portions of
14 Plaintiffs' First Amended Complaint [27].   However, because the Court
15 finds that the FAC, generously construed, would state a valid price
16 squeeze claim under <u>Brooke Group</u>, the Court DENIES Defendants' Motion
17 to Dismiss the First Amended Complaint [27].   Finally, because the
18 question of whether <u>Trinko</u> bars price squeeze claims where the
19 parties are compelled to deal under the federal communications laws
20 is a controlling question of law about which there is a substantial
21 ground for difference of opinion, and because a resolution of this
22 issue could potentially spare the parties considerable time and

23

24

25 [22] In light of the Court's holding that the FAC can be read to state a
26 viable price squeeze claim under <u>Brooke Group</u>, the issue before the
   Ninth Circuit will nöt only be whether <u>Trinko</u> bars price squeeze
27 claims generally but, more specifically, whether it bars predatory
   price squeeze claims (i.e., price squeeze claims which comply with
28 the <u>Brooke Group</u> requirements).

1    expense in protracted discovery, the Court GRANTS Defendants' Motion

2    to Certify October 20, 2004, Order for Interlocutory Appeal [27].

3

4

5         IT SO ORDERED.

6

7    DATED: 3/31/05

8                                        STEPHEN V. WILSON
                                         UNITED STATES DISTRICT JUDGE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    33